(No. 17985.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOE CHESNAS, Plaintiff in Error.

*Opinion filed April 20, 1927.*

1. CRIMINAL LAW—*a defendant will not be permitted to withdraw plea of guilty merely because he receives heavier sentence than expected.* Where a defendant pleads guilty to murder after having the effects of his plea fully explained to him and the court imposes the death sentence, he will not be allowed a motion to vacate the judgment and to withdraw his plea merely because he was led to believe the court would not impose the extreme penalty.

2. SAME—*when defendant seeking to withdraw plea of guilty after sentence of death cannot complain of admission of confession.* Where a defendant pleads guilty to murder after having the effect of his plea fully explained to him and the court imposes the death sentence after hearing evidence, which included a confession, the defendant will not be allowed a motion to vacate the judgment and withdraw his plea on the ground that he was tricked into making the confession, and that his counsel, when they advised him to plead guilty, were unaware of the circumstances under which the confession was obtained, where the defendant's counsel expressly admitted on the trial that the confession was true and made no objection to it and on the motion to vacate make no claim that any part of the confession is not true.

WRIT OF ERROR to the Circuit Court of Saline county; the Hon. A. E. SOMERS, Judge, presiding.

ALPHEUS GUSTIN, SCERIAL THOMPSON, and S. D. WISE, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, CHARLES T. FLOTA, State's Attorney, VIRGIL L. BLANDING, and K. C. RONALDS, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

William Unsell, a rural mail-carrier living in Harrisburg, in Saline county, was murdered on the night of Sunday, August 8, 1926, before midnight, while lying in bed at his home, asleep, and Joe Chesnas was arrested the next

day.  The June term of the circuit court was still in session, and on August 11 a venire for a special grand jury was issued on the order of the court, returnable August 13. On that day an indictment for the murder, in two counts, was returned against Chesnas.  On August 28, it appearing that Chesnas was unable to employ counsel to defend him, the court appointed A. Gustin, Scerial Thompson and S. D. Wise, attorneys of the court, to defend him.  The September term began on September 13, and on September 14 a motion to quash the indictment was made and overruled.  The defendant was arraigned and entered a plea of not guilty.  The case was called for trial on September 20, and thereupon, on motion of the defendant, he was permitted to withdraw his plea of not guilty and enter a plea of guilty.  Being admonished by the court and having the consequences of his plea of guilty fully explained to him and having been advised of his right to a trial by jury he persisted in his plea, and the court proceeded to hear the testimony of witnesses.  After hearing the evidence the court adjourned until the next day, when judgment was entered against the defendant, sentencing him to death, fixing October 16, 1926, as the date for the execution of the sentence.  The Governor granted a reprieve to the defendant, and on October 27 a motion was presented to the court to vacate the judgment and give defendant leave to withdraw his plea of guilty.  This motion was overruled.  A writ of error was granted to review the record.

A great number of errors are assigned, but the only one argued and relied upon is a denial of the motion to vacate the judgment and permit the defendant to withdraw his plea of guilty.

The plaintiff in error, Joe Chesnas, testified in his own behalf at the hearing on his plea of guilty that he had three brothers and two sisters.  His father left home when Joe was ten or eleven years old and his family never heard from him afterward.  His mother washed for a year or

two to support the family. Joe and his brothers then began to steal, and when he was thirteen years old Joe was sent to St. Charles for burglary and larceny and remained there for seventeen months. He was at home for three or four years afterward, and during that time worked some but was stealing and gambling most of the time, and at the end of that time was sent to Pontiac for burglary and larceny. He spent most of his time with bootleggers. He shot a man in the arm once because he wouldn't put his hands up, and another time he shot a man in a fight at Joe's house but did not kill him. He began carrying fire-arms when he was fourteen. He was sent to Pontiac a second time for robbing an oil station and came back to Harrisburg on parole in April, 1926. Since that time he had been stealing, drinking and gambling around Harrisburg. His mother was a Lithuanian, who could not speak or understand English well.

On Thursday night, August 5, Chesnas, together with Joe Ingram and Alfred Dixon, robbed Unsell. Ingram and Dixon were arrested and Unsell identified Dixon. On Sunday Chesnas went to Shawneetown and got back to Harrisburg about five or six o'clock. After eight o'clock he went "down to a joint in the West End and drank homebrew." About nine o'clock he went toward Unsell's, having a pint of whiskey, of which he drank about half before he got there. He saw Unsell standing in the doorway, but did not want to kill him there and waited until he went inside and went to bed. Before Unsell went in he locked the screen door. Chesnas waited until both Unsell and his wife went to bed. He went around to the side, intending to shoot through the window, but the blind was down and he could not see. He went to the back of the house, tore down the screen, and as he put his foot over the window sill he knocked down two chairs which were sitting in front of the window. He turned on the flash-light, saw Unsell, pulled the trigger, jumped out the window and went back

to the West End. Mrs. Unsell screamed. Chesnas did not stop or hesitate. He was drunk but knew what he was doing. He signed a confession and swore to it at Benton and told different witnesses about the murder and told Charles Birger and the sheriff. He knew he could be hanged. He had been in jail in Harrisburg several days and the rest of the time at Benton. On cross-examination by the State's attorney he said that he knew what he was doing when he shot Unsell; that he had gone to school some in the second and third grades, in West Frankfort, where he had lived before coming to Harrisburg.

The confession which Chesnas testified he signed and swore to was offered in evidence by the prosecution. His counsel stated that they admitted that he had signed the confession and that it was a true and correct statement of what he said, but they objected to its being read for the reason that the defendant was present in court and his counsel would put him on the witness stand for the purpose of stating the facts and circumstances in connection with the case. The court said: "Have no objection to its going in evidence but do not want it read in open court here. The record may show it read." It is not argued that there was any error in receiving the confession in evidence. In the confession Chesnas stated the details of the robbery of Unsell at his house on Thursday night; that Ingram, Dixon and Chesnas went to Unsell's house after nine o'clock believing that he usually had about $200 in the house, but they got only six dollars. Dixon had a revolver but Chesnas had none. They divided the six dollars equally among them. After Chesnas got back from Shawneetown Sunday night he went home and got his .38-calibre Colt's revolver, which was fully loaded. He then went to Tony Cassell's place, and from there, between nine and twelve o'clock, to Unsell's house, where he murdered Unsell, as stated in his testimony. He then went to Cassell's, told him what he had done and gave him the revolver. He and Tony then

went to bed together. The next morning Tony told him he had gone to his father's house, got the revolver, wrapped it in paper and hid it along the fence. The reason Chesnas shot Unsell was because Dixon had already been arrested for the robbery and identified by Unsell, and Chesnas was afraid that he would be identified also by either Mr. or Mrs. Unsell and both would be sent to the penitentiary for the robbery. Mrs. Unsell testified on the hearing and other witnesses testified to statements of the defendant admitting the commission of the crime. There is no dispute about the facts and no claim that the defendant is not guilty of murder.

The motion to vacate the judgment and permit the defendant to withdraw the plea of guilty was based on the following grounds stated in the motion:

"(1) The defendant is not now and has not been properly advised and represented.

"(2) His cause has not been properly and fully prepared and presented.

"(3) The plea of guilty was not fully and properly explained to him.

"(4) The plea of guilty was entered by the defendant while under the influence of fear, anxiety, excitement and duress of mind and under a misapprehension of the situation.

"(5) The defendant did not fully understand or comprehend the probable consequences of a plea of guilty.

"(6) The defendant was improperly advised, influenced and misled into pleading guilty under the belief that by so doing he would not receive the extreme penalty known to the law but would be shown mercy and clemency by the court.

"(7) The constitutional rights and liberties of the defendant were invaded and denied him in unlawfully procuring from him, and using against him, confessions and admissions involuntarily made.

"(8) Counsel for the defendant, prior to the hearing in said cause, was led to believe that the State's attorney was in possession of a written confession by said defendant properly obtained and voluntarily made and therefore permitted said purported confession to be introduced in evidence without objection, whereas said purported confession was unlawfully obtained, in violation of the defendant's constitutional rights, by threats of violence and by one Charles Birger, who upon the arrest of said defendant, and while defendant was confined in the city jail of Harrisburg, Illinois, induced the officers of said city, together with the sheriff of said county, to lock the said Charles Birger in the same cell with the defendant, ostensibly under arrest, the said Charles Birger theretofore having been a friend of said defendant and a person in whom said defendant placed confidence; that said Charles Birger, while so pretending to be arrested, falsely represented to the defendant that a mob composed of a large number of men was being formed on the outside for the purpose of lynching the said defendant, and that if the defendant would confess to the homicide in question the said Charles Birger would secure his own release from jail and would return with his men and by force or otherwise remove said defendant to some safe place and enable him to escape such mob; that said defendant, because of the false representations of said Charles Birger and of others, was induced to make admissions and confessions in regard to said crime without the advice of counsel and in violation of his constitutional rights.

"(9) The court was not fully and sufficiently advised of the facts in said cause and did not sufficiently investigate said cause.

"(10) The sentence and judgment of the court is cruel, excessive and unusual, was made without consideration of the accountability and responsibility of the defendant, and is not warranted by the facts in the case in the manner and form in which they were presented."

The first two grounds have no foundation in fact. The plaintiff in error was defended by three attorneys appointed by the court. These gentlemen are now excessively modest in the estimate of their professional qualifications, but we do not agree with their disparaging appraisal of their abilities. Before his arraignment the plaintiff in error told the court that he wanted Alpheus Gustin for one of his attorneys, and that Gustin told Chesnas to come to him any time when he got into trouble. Gustin was an experienced attorney, to whom the plaintiff in error had been paroled from the reformatory at Pontiac. No real argument or attempt at a showing is made questioning his ability properly to represent the plaintiff in error. In his affidavit he states that the plaintiff in error had failed to report to him as under his parole it was his duty to do, and for that reason Gustin had severely reprimanded him and Chesnas became unfriendly toward Gustin, and Chesnas' conduct toward Gustin had produced a similar feeling upon Gustin's part toward Chesnas and caused a strained relation between them, and Gustin stated these things to the court at the time of his appointment. Gustin was also employed by Tony Cassell, who was indicted as accessory after the fact to this murder, and he states that he ascertained that Cassell's interest and Chesnas' were antagonistic, and that by reason of these adverse interests he could not consult or properly advise in Chesnas' case, but he did advise the plea of guilty, and that he did not believe the court would inflict the extreme penalty. The evidence does not show any inconsistency in the interests of Cassell and Chesnas and no inconsistency was disclosed on the trial. The record shows that Gustin not only could properly represent the plaintiff in error but that he did so, and the record fails to show that the defendant was not properly advised and represented or that his cause was not properly and fully prepared. S. D. Wise and Scerial Thompson, who were also appointed with Gustin, were attorneys of the court, Wise

having been engaged in the practice of the law for twelve years and Thompson for about two years, and though their practice had been confined for the most part to civil causes, there is no intimation that the defendant suffered because of any incompetency or neglect of his attorneys.

The third, fourth and fifth grounds of the motion are contradicted by the record, which shows that the defendant was fully informed by the court, before entering his plea, as to the consequences and as to his rights. He testified that he knew he might be hanged, and the record is supplemented, though there was no necessity that it should be, by the testimony of witnesses showing that the plea was fully explained and he was fully advised as to its effect. The plaintiff in error states that when he was taken into court to plead there was a great crowd of people present, and after what had been told to him concerning the mob he was afraid not to enter a plea of guilty but did so at the request of counsel, against his will; that the court took only a few minutes to tell him of the consequences of the plea, and because of the excitement in the court room and his fear he did not understand the consequences of his plea. Naturally, the defendant was suffering from fear, anxiety, excitement and distress of mind, but he had no misapprehension of the situation or of his rights or want of comprehension of the probable consequences of the plea. He chose a course which seemed best to him and his counsel for him to take, and there is no ground, because the penalty imposed was heavier than he supposed it would be, to permit him to withdraw his plea and enter another of not guilty.

The sixth ground is answered by what has already been said. The defendant was not misled into pleading guilty and was not improperly advised or influenced. The only basis for this assignment is that the court imposed the highest penalty, and that is no reason why the judgment should be set aside and the plaintiff in error, who is confessedly

guilty, should have an opportunity to endeavor to induce a jury to impose a lighter penalty.

The ninth and tenth grounds have no basis in fact. The court was fully advised of all the facts material in determining the guilt of the defendant and his punishment. He carefully heard all the evidence offered, there was no dispute in the facts, and the sentence imposed was not made without consideration of the accountability and responsibility of the defendant and was fully warranted by the facts.

By the seventh and eighth grounds it is claimed that the constitutional rights and liberties of the defendant were denied him by unlawfully procuring from him, and using against him, confessions and admissions involuntarily made. Assuming the facts to be as stated in the eighth ground of the motion, they show no ground for a reversal of the judgment. It is immaterial whether the confession which he made was admissible in evidence or not. He made it, it was offered against him, his counsel expressly admitted on the trial that it was true and made no objection to it, and therefore no question of its admissibility can arise on this record. The only reason that evidence was heard on the hearing of his plea of guilty was to enable the court properly to exercise its discretion as to the extent of the punishment. The plaintiff in error does not contend that any part of the confession is not true. The extent to which his affidavit goes is, that before the trial he did not truthfully advise and inform his counsel of all the facts of the case but that he has now done so, and has been advised by counsel that these facts which he did not truthfully state or refused to state are material to the issues in this cause, and that he believes that if granted a new trial he will be able to convince the court by material evidence that he should not be hanged. No facts are disclosed which could be shown on another trial affecting the guilt or innocence of the defendant or the circumstances of aggravation or mitigation of the crime. It is only shown

325—24

that the plaintiff in error did not inform his counsel of the circumstances under which the confession was signed. It would be a travesty of the administration of justice to allow a new trial to a defendant pleading guilty to an indictment for murder, where all the facts are admitted, because he had not revealed to his attorneys all the circumstances of a confession which he had made, in order that he might endeavor to secure from the jury a verdict more favorable than the death sentence.

The judgment of the circuit court was right, and it is affirmed. The seventeenth day of June, 1927, is fixed as the time for the execution of the original sentence of death.

*Judgment affirmed.*